IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
vs.                              )        No. 12-20099-STA-dkv
                                 )
RICHARD GLEASON,                 )
                                 )
        Defendant.               )

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

_____

The defendant, Richard Gleason, has been indicted on one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1) and one count of possessing a firearm as an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(3). These charges arise out of what began as an encounter by police officers with the driver of a stationary vehicle in which Gleason was sitting as a passenger, and culminated in the seizure by police officers of a 9mm caliber pistol, eight rounds of 9mm ammunition, and multiple clear plastic baggies of marijuana, all from Gleason's immediate area in the vehicle. Gleason has moved to suppress the above physical evidence as well as any and all statements he made during his subsequent detention. (D.E. 28.) As a basis for his motion, Gleason argues that the evidence was obtained

pursuant to an unreasonable seizure in violation of the Fourth Amendment. The government filed a timely response in opposition. (D.E. 38.) The motion was referred to the United States Magistrate Judge for a report and recommendation.

Upon motion of the government, the court held an evidentiary hearing on February 13, 2013. At the hearing, the government called two witnesses, Officer Onrico Atkins of the Memphis Police Department (MPD) and Special Agent Ali Roberts of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) (collectively referred to as "the officers"), and introduced into evidence a diagram that Agent Roberts drew from the witness stand indicating the location of Officer Atkins's parked squad car relative to the vehicle in which Gleason was a passenger. The defendant called as a witness the driver of the subject vehicle, Quinton Moore, and introduced into evidence a diagram—drawn by Moore from the witness stand—portraying somewhat differently the location of Officer Atkins's squad car relative to the subject vehicle. The defendant then testified on his own behalf.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be granted.

## I. PROPOSED FINDINGS OF FACT

As part of a joint initiative between the ATF and MPD's Delta Shift Task Force targeting violent individuals, convicted felons, and gangs, Agent Roberts began in early 2012 occasionally riding as a passenger in Officer Atkins's squad car during the latter's patrol-duty shifts. Indeed, Agent Roberts had joined Officer Atkins on his shift late at night on March 1, 2012. That night, the officers were conducting routine patrol in an unmarked squad car in the north precinct of Memphis, Tennessee, when they drove onto the grounds of an apartment complex that they knew had a reputation for a high volume of gang and other criminal activity.

As they approached from the rear of the complex, the officers observed a White Toyota Camry pull out of a parking space on the complex grounds. Officer Atkins testified that as soon as he made eye contact with the African-American male driver of the Camry as the vehicle was halfway out of the parking space, the driver immediately pulled back in the space with considerable "velocity." This was a move the officers viewed as consistent with "ducking," a mode of conduct in which an individual makes sudden movements to avoid police attention. The "ducking" was sufficient to arouse suspicion in the officers, which suspicion the officers conveyed aloud to one another. Officer Atkins then pulled the squad car up to the

rear of the Camry "to see what was going on." Officer Atkins testified that, in doing so, he had no intentions of searching the vehicle or arresting its occupants and, accordingly, he did not activate emergency lights or a siren.

The driver of the Camry, later identified as Moore, had begun to exit his vehicle via the driver's side door. The officers immediately got out of the police car, whereupon Agent Roberts walked toward the right side of the Camry and Officer Atkins, walking toward the left side, asked Moore "Hey, what are you doing?" as Moore walked away from the vehicle. Both of the officers were in uniform and neither had their guns drawn or flashlights out. Officer Atkins testified that Moore was compliant and voluntarily began walking back toward the Camry.[1] The officers observed that three passengers (all of whom the officers perceived to be African Americans) remained in the Camry: a male in the front passenger seat, another male in the rear left seat, and a female in the rear right seat.

---

[1]   Officer Atkins's testimony is somewhat conflicting in regard to the location of Moore when Officer Atkins first called out to him ("Hey, what are you doing?"). Officer Atkins testified that he commenced the conversation with Moore while Moore was walking away but still between the vehicle and the open driver's-side door. (Agent Roberts's testimony described Moore's location in an almost identical manner.) However, Officer Atkins also testified that Moore responded to the initial callout by "[coming] back toward the car," which would imply that Moore's location at that time was some further distance from the vehicle.

A conversation then ensued between Officer Atkins and Moore. Officer Atkins testified that the conversation took place while he was standing next to the rear left passenger door to the Camry and Moore was standing between the vehicle (the Camry) and the open driver's-side door. According to Officer Atkins, Moore never asked or attempted to leave the situation, and Officer Atkins never indicated that he would not be free to do so. Although Officer Atkins cannot recall many specifics from the conversation, he testified that, while standing there, he smelled the odor of raw marijuana and remembers stating as much aloud to Moore, to which Moore responded by admitting that he and the other occupants of the Camry had smoked marijuana that night. This prompted Officer Atkins to detain Moore in his squad car, after which the other three occupants of the Camry were asked to exit the vehicle.

Much inquiry was made during Officer Atkins's testimony as to exactly *where* he parked his squad car, vis-à-vis the Camry, when he and Officer Roberts jumped out of the car and commenced the encounter with Moore. On direct, he testified that he pulled up and parked the squad car "to the west of the rear of the [Camry]." However, on cross, counsel for the defendant confronted him with his testimony at a state court preliminary hearing in this case during which he described the position of his squad car somewhat differently. At the earlier hearing,

Officer Atkins testified that he had pulled up and parked his squad car "just a little offset behind [the Camry]," which he then clarified—later in that same testimony—to mean "partially behind the car but not fully behind it." Officer Atkins acknowledged making those statements. He also agreed, as he had done when testifying at the state court preliminary hearing, that his bumper was a "little bit in front of" the Camry's rear bumper but he insisted, at the suppression hearing, that he wasn't blocking the Camry in.

Agent Roberts's testimony, although largely consistent with that of Officer Atkins, differed with respect to the placement of the parked squad car. Agent Roberts testified that in fact no portion of the front bumper of the parked squad car was covering the rear bumper of the Camry. Agent Roberts drew a diagram—which was admitted into evidence as Exhibit 1—reflecting as much.

Agent Roberts supplemented Officer Atkins's account of the incident by describing what he (Agent Roberts) did and observed with respect to the other three occupants of the Camry while Officer Atkins was conversing with Moore. Agent Roberts testified that he was peering into the inside of the Camry for safety reasons and, around the time Officer Atkins announced that he smelled marijuana, he (Agent Roberts) saw the rear left passenger, who was later identified as Gleason, stuff something

under a child's seat next to him.  Agent Roberts opened the door, asked Gleason to exit the vehicle, and quickly confirmed that there were indeed several baggies of what appeared to be marijuana underneath the child's seat.  Upon exiting the Camry, Gleason took off running in an attempt to flee the scene, but Agent Roberts apprehended and handcuffed him 15-20 feet away.

The testimony of the officers is consistent that a subsequent search of the Camry revealed baggies of raw marijuana underneath the child's seat in the rear middle seat of the vehicle and a handgun (the 9mm caliber pistol) on the floor underneath the driver's seat directly in front of where Gleason was sitting.[2]  Agent Roberts testified that Gleason admitted to him in an interview that same night that he (Gleason) owned the handgun found in the vehicle.  Of the four occupants of the Camry, only Gleason was arrested.

The two witnesses for the defendant were largely consistent with one another in their accounts of the March 1, 2012 incident, but their collective story differs significantly from that of the officers on a number of points.  Quinton Moore testified that on the night in question he had been hanging out in his apartment with three friends: Gleason, a male by the name of LeDarius ("Turtle"), and LeDarius's sister Jameka.  According

---

[2]    There was no testimony on the location or apprehension of any ammunition in the vehicle.

to Moore, at the time of the incident, he and the three friends had loaded into his 1995 Toyota Camry and were about to leave his apartment complex because he was planning to drop the friends off at their homes and then go to the store. He testified that after he pulled partially out of the parking space, he immediately pulled back in the space because he realized he had left his money inside the apartment. He got out of his car and began to climb a flight of outdoor stairs up to his apartment, but stopped when he heard someone yell at him, "Stop. Where are you going? Come back down here." He turned around and saw Officer Atkins standing in front of the squad car below. He replied that he was going inside to get his money so that he could go to the store. Moore testified that Officer Atkins responded, "Bring your ass back down here. Are you trying to get in more trouble?" Moore testified that he complied, and began walking toward Officer Atkins at the squad car. He testified that, at that time, he observed Agent Roberts slowly walking toward the right side of the Camry.

Like Moore, Gleason testified that what prompted Moore to abruptly pull back in the parking space was his realization that he had forgotten his money inside. According to Gleason, none of the occupants even noticed the presence of Officer Atkins's squad car until after Moore was already exiting the vehicle. He testified that when he (Gleason) did notice the car, which was a

white Dodge Charger, he recognized it to be an unmarked police patrol car. According to Gleason, Moore was already ascending the steps by the time Officer Atkins called out to him because it had taken Officer Atkins a few seconds to get out of his car. He stated that he does not recall Moore leaving open the driver's-side door to the Camry. He also testified that Officer Atkins never walked up to the Camry, but instead exited his squad car, walked around it, took 2-3 steps, called out to Moore, and then waited for him at the squad car. Similarly, Gleason testified that, at that point, Agent Roberts was also standing back close to the squad car.

Moore and Gleason both testified to the effect that Officer Atkins's parked squad car was blocking the Camry in. While on the witness stand, Moore drew a diagram depicting the relative location of the two vehicles, and according to the diagram, which was consistent with Moore's testimony and with the later testimony of Gleason, half of the squad car's front bumper was covering the rear bumper of the Camry. Moore's diagram was admitted into evidence as Exhibit 2. Gleason confirmed the testimony of the officers that there were no flashing lights or sirens activated.

Moore testified that he conversed back and forth with Officer Atkins while he (Moore) walked down the stairs, past the Camry, and toward the squad car. He did not recall the entire

conversation but did testify that he remembers telling Officer Atkins that he "was fixing to get back in [the] car" to drop his friends off. He testified that Officer Atkins responded, "No, we are going to search your car because it was suspicious." According to Moore, he did not feel free to leave during this time. He also testified that Officer Atkins never mentioned anything about *smelling* marijuana, but he does remember that Officer Atkins asked him whether he had been smoking marijuana, and he remembers answering in the affirmative. He testified that Officer Atkins then forced him against the squad car, frisked him, and placed him in the back of the squad car, along with Turtle. The officers then performed a search of the Camry.

When questioned at the hearing about his drug use on the day in question, Moore admitted to smoking two blunts of marijuana that day and stated that he typically remains "high" for approximately thirty minutes after smoking one blunt. Gleason also testified that he believes it is possible Moore was high at the time of the subject encounter. Moore also admitted that he had been arrested on a later occasion by the same two officers.

The court finds that, for the most part, the testimonies of both officers were credible. However, their testimonies did contradict each other on the location of Officer Atkins's squad car relative to the Camry. On that point, the court finds as

fact the testimony of Officer Atkins at the preliminary hearing, which comports inpart with the testimonies of both Moore and Gleason, that the front bumper of the squad car intersected, at least partially, the rear of the Camry. The court further finds as fact that where no guns drawn or flashing lights or sirens activated. The court submits that all other points of contradiction between the officers' combined account and that of the two defense witnesses are not germane to the suppression analysis.

## II. PROPOSED CONCLUSIONS OF LAW

The Sixth Circuit has identified three types of police-citizen encounters that are permissible under the Constitution: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000)(internal quotation marks omitted). Gleason contends that the officers commenced an investigative detention, requiring reasonable suspicion, the moment they pulled up and parked the squad car partially behind Moore's Camry, thereby blocking the car in the parking space. Gleason further argues that there was no reasonable suspicion for the officers to conduct an

investigative detention and that instead the officers were acting upon a mere hunch. The government, on the other hand, argues that the officers initially approached Moore and the Camry as a consensual encounter and that the encounter remained consensual at least until Moore was placed in the back of the squad car and the other occupants were asked to exit the Camry, at which time the officers had developed reasonable suspicion of criminal activity based on, among other circumstances, Officer Atkins's detection of the odor of marijuana emanating from the vehicle.

A.  Seizure v. Consensual Encounter

The concept of seizure defines the line between a consensual encounter and an investigative detention. "A consensual encounter can ripen into a seizure if in light of all the circumstances, [] a reasonable person [would] have believed that he or she was not free to [leave]." *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004). Gleason argues that the officers seized the Camry and him, as its passenger, when they parked their squad car in such a position as to block the Camry's egress out of the parking space. He relies on *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) and *United States v. Gross*, 662 F.3d 393, 399–400 (6th Cir. 2011), in which the Sixth Circuit concluded that a seizure occurs when an

officer uses his marked patrol car to block a vehicle in its parking space.

In *See*, the defendant and two other individuals were sitting inside the defendant's vehicle in the parking lot of a public-housing complex when a police officer pulled his patrol car in front of the defendant's vehicle such that the vehicle had no egress from its parking space. *See,* 574 F.3d at 311–12. The defendant sought to suppress the evidence that resulted from a subsequent search of his vehicle. The court concluded that, from the very start, the encounter constituted a seizure of the defendant because a reasonable person in the defendant's position, having had his vehicle blocked in by a police squad car, would not feel that he was free to leave. *Id.* at 313. In his concurring opinion, Judge Gilman noted that the officer had "every right" to look into the situation, "but he should have simply parked his patrol car alongside [the defendant's] vehicle to carry out the investigation in a consensual manner." *Id.* at 315 (Gilman, J., concurring). By instead parking his patrol car "in such a way so as to block in" the defendant's vehicle, the officer had "transform[ed] the encounter into a[n investigative] stop." *Id.*

To the extent this case is distinguishable from *See* in that Gleason was the passenger and not the driver of the blocked-in vehicle, *Gross* is controlling. In *Gross*, as in *See*, the

defendant was sitting inside a vehicle in the parking lot of a public-housing complex when a police patrol car pulled up, this time behind the vehicle, and blocked the vehicle in its parking space. *Id.* at 396. Unlike in *See*, the defendant in *Gross* was not the driver of the subject vehicle; rather, the defendant was slumped down in the front-passenger seat of the vehicle and, although the engine was running, the vehicle had no apparent driver. *Id.* The court determined that "[b]ecause [the officer's] actions here were markedly similar to [the officer's] actions in *See*," the officer had begun an investigatory seizure, which required reasonable suspicion, when he blocked the subject vehicle in its parking space. *Id.* at 400. The court found that even though Gross was the passenger and not the driver of the vehicle, he was still an object of the seizure because, as is well established, "the passenger in a seized vehicle is also made to feel that he is not free to leave."[3] *Id.* n.1 (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)); *see also United States v. Jones*, 562 F.3d 768, 772–73 (6th Cir. 2009)(finding that "a warrantless 'seizure' had occurred at the time the [subject vehicle] was hemmed in by the [] police vehicles" because, "by blocking in the [vehicle], the officers

---

[3]     In so holding, the Sixth Circuit impliedly rejected the argument of the government here, that the passenger of a parked, driverless vehicle is not seized when the vehicle's egress is blocked because there is nothing to prevent the passenger from simply exiting the vehicle and walking away.

had communicated to a reasonable person occupying the [vehicle] that he or she was not free to drive away").

As stated above, the court found credible the testimonies of Moore, Gleason, and Officer Atkins with respect to the position of Officer Atkins's squad car relative to the Camry when he pulled up and parked behind it. Accordingly, the court finds that Officer Atkins's squad car was parked in such a manner so as to block at least some portion of the Camry's rear bumper. The court sees no material distinction between the positioning of the squad car here, relative to the subject vehicle, and that of the vehicles in *Gross*, where the squad car was said to have been parked "directly behind" the other vehicle.[4] The determinative question is not whether the police car was parked directly behind or only partially behind the vehicle, but rather whether a reasonable person inside the vehicle would feel free to leave under the circumstances. In conducting that inquiry here, the court is conscious that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive significance." *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. 1982).

---

[4]    The court's opinion in *See* does not make clear the exact positioning of the vehicles there, only that the officer had parked his squad car in front of the defendant's vehicle "so that [the defendant] was unable to drive away."

From the perspective of a person in Gleason's position, terminating the encounter would have involved either exiting the Camry and abandoning it in the immediate presence of police officers or, if it were even possible, backing the Camry out of the parking space by first pulling up as far as possible into the space and then maneuvering around the squad car in an attempt to exit the space. A reasonable person would not feel free to leave, having been left with such unattractive—and questionably feasible—options for doing so. *See United States v. Packer*, 15 F.3d 654, 657 n.3 (7th Cir. 1994)("Although . . . there may have been room for the driver to maneuver the car out . . . it still seems unlikely that a reasonable person . . . knowing that he was the focus of police attention would believe that he was free to maneuver his car out of the parking space."); *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986)(stating that a reasonable person in the appellants' position would not have felt free to leave where it was doubtful that "appellants could have maneuvered their car out of the parking lot in this situation."); *United States v. Hicks*, No. CRIM.A.08-271, 2009 WL 3150394, at *4 (E.D. Penn. Sept. 23, 2009)(finding that the officer had seized the occupants of a vehicle by partially blocking it in a parking space because, although it was theoretically possible the vehicle could have found a way to exit the parking space by maneuvering around the

patrol car, in reality, "a reasonable person in the situation . . . would not feel free to ignore the police officer and go about his or her business").

Furthermore, the act of parking in the travelling portion of a parking lot immediately behind a vehicle legally parked in a delineated parking space necessarily suggests an obstructive motive because such is wholly inconsistent with how parking lots are "routinely used." *Cf. O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011)(noting that "parking behind a vehicle in a driveway does not inherently send a message of seizure because it is how driveways are routinely used"). Doing so here inherently sent a message of seizure to anyone occupying the Camry. For all of these reasons, the court concludes that the actions of the officers in parking the squad car behind (albeit partially behind) the Camry constituted a seizure, not only of the vehicle, but of its occupants the same.

That Officer Atkins's squad car was unmarked does not alter the court's conclusion that a seizure occurred. In *United States v. Jones*, 562 F.3d 768 (6th Cir. 2009), the Sixth Circuit found that by using their squad cars to block a vehicle into a parking space, "[police officers] had communicated to a reasonable person occupying the [vehicle] that he or she was not free to drive away." *Id.* at 772. This communication had been effectuated even though the squad cars were unmarked. *Id.*

Moreover, in the present case, the testimony was consistent among all four witnesses that the officers exited the squad car immediately or soon after pulling up behind the Camry. Thus, even if the absence of identifying information on the outside of the squad car did undermine in some way the suggestion that a reasonable person occupying the Camry would not have felt free to leave, the fact that the officers were in uniform sent clearly the message, the moment they exited the squad car, that the Camry's egress had been blocked by the actions of law enforcement.

B.  <u>Reasonable Suspicion</u>

Generally, under the Fourth Amendment, a police seizure of a person must be supported by probable cause. *United States v. Fountain*, 2 F.3d 656, 661 (6th Cir. 1993), *overruled on other grounds by Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999). In *Terry v. Ohio*, 392 U.S. 1 (1968), Supreme Court set forth an exception to the probable cause requirement for limited investigatory seizures. *Id.* at 21-22. "[A] policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)(footnote omitted)(quoting *United States*

*v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). To establish that a seizure not supported by probable case was "reasonable," the law enforcement officer must have a reasonable, articulable suspicion that crime is afoot. *Terry*, 392 U.S. at 21–22. Reasonable suspicion cannot be based on an officer's "'inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences [] which he is entitled to draw from the facts in light of his experience.'" *United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008)(quoting *Terry*, 392 U.S. 1 at 27).

The court must determine here whether the investigative seizure of the Camry and its occupants was justified at its inception under this less stringent "reasonable suspicion" standard. *United States v. Bradshaw*, 102 F.3d 204, 211 n.13 (6th Cir. 1996). The government bears the burden to prove, by a preponderance of the evidence, "the existence of reasonable suspicion to believe—based upon objective and articulable facts—that the defendants were engaged in criminal activity." *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008). To meet this burden, the government must first articulate specific facts to justify the initial detention. *Id.* at 551. Here, the facts available to the officers at the time they initiated the investigative seizure were as follows: (1) that it was late in the evening; (2) that the Camry was parked in a high-crime area;

(3) that the driver of the Camry made eye contact with Officer Atkins while backing the vehicle out of a parking space and that, immediately upon doing so, the driver stopped backing out of the space and instead pulled the Camry swiftly back into the space.

The first two facts—presence in a high-crime area and the late night hour—"are context-based [facts] that would have pertained to anyone in the parking lot at that time," *see See*, 574 F.3d at 314, and, although relevant to the analysis, they are not "independently dispositive" and, similarly, should not be given undue weight. *Hoover v. Walsh*, 682 F.3d 481, 495 (6th Cir. 2012); *See*, 574 F.3d at 314; *see also United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006)(exercising caution in applying the high-crime label in light of the "special concerns of racial, ethnic, and socioeconomic profiling" that accompany "labeling an area 'high-crime'"). Thus, the contextual considerations here support reasonable suspicion but do not, standing alone, establish it.

Turning to the remaining fact—that Moore hurriedly pulled the Camry back into the parking space after making eye contact with Officer Atkins—the Supreme Court has explained that "nervous evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In *Wardlow*, the evasive behavior at issue was the

defendant's "unprovoked flight upon noticing the police." *Id.* at 122. While "[h]eadlong flight" is the "consummate act of evasion," *id.* at 124, other sorts of "furtive movements made in response to police presence may also properly contribute to an officer's reasonable suspicion." *Brignoni-Ponce*, 422 U.S. at 885; *Caruthers*, 458 F.3d at 466. The Sixth Circuit has cautioned, however, that "[a]lthough the police may validly consider an individual's furtiveness in deciding whether to conduct a *Terry* stop, courts must take care that the factor not be invoked cavalierly" to avoid the use of "subjective, promiscuous appeals to an ineffable intuition" in place of objective, particularized facts. *Id.* at 466–67 (quoting *United States v. Broomfield*, 417 F.ed 654, 655 (7th Cir. 2005)).

Following *Wardlow*, there has been an ongoing and extensive debate "about what types of responses to police arrival arouse a suspicion of wrongdoing." *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011); *accord United States v. Johnson*, 620 F.3d 685, 694–95 (6th Cir. 2010)(collecting cases). It is fairly well established, however, that simply walking away from an officer is not a type of response that will contribute to reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 498 (1983); *see also United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003)(stating that 'walking away from the police when they got out of their unmarked car constitutes a factor" so

innocent as "to be outrightly dismissed" in assessing the existence of reasonable suspicion). Relatedly, the speed of the suspect's movements may be relevant in analyzing the circumstances giving rise (or not) to reasonable suspicion. *Caruthers*, 458 F.3d at 466. Even so, the fact that a suspect moves "hurriedly, briskly, or snappily . . . does not turn his otherwise innocuous behavior into the conduct of a 'suspicious suspect.'" *Beauchamp*, 659 F.3d at 571. Ordinarily, a suspect's exercise of his right to move himself, in any manner short of outright flight, away from arriving police will not be sufficient to create reasonable suspicion of criminal activity. *See id.* at 570-71. Instead, in cases where a suspect walks away or engages in other similar types of ordinarily innocent conduct in response to police presence, the Sixth Circuit has found reasonable suspicion only where such conduct is combined with "specific facts [showing] that the defendant's behavior was otherwise suspicious." *Id.; see, e.g. United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008)(upon seeing police officer, "[hunching over, placing his hand in the small of his back, and starting [to] walk away" in a manner that suggested he "had a weapon and was getting ready to fire" (internal quotation marks omitted)); *United States v. Paulette*, 457 F.3d 601, 602 (6th Cir. 2006)(engaging in hand-to-hand transaction in high-crime area and "quickly mov[ing] his hand to his pocket and

[beginning] to walk away" upon noticing a police squad car); *Caruthers*, 458 F.3d at 462 ("[taking] off real quick . . . semi-running and hunch[ing] down" against a wall as if to conceal a weapon or contraband); *United States v. Helm*, 85 Fed. App'x 475, 476 (6th Cir. 2004)(parking car in section of empty restaurant parking lot away from restaurant and very close to neighboring business that had been repeatedly burglarized, combined with driving away from police in an evasive manner).

Here, the only arguably suspicious circumstance specific to the occupants of the Camry is the Camry's abrupt movement back into the parking spot after Moore spotted Officer Atkins. The court finds analogous the circumstances leading up to the encounter at issue in *United States v. Keith*, 550 F.3d 499 (6th Cir. 2009), which circumstances the Sixth Circuit found did not support reasonable suspicion. There, the defendant and a friend were conversing outside a liquor store in a bad neighborhood and at a late hour, and, after glancing in the direction of nearby police cars, they moved behind the store and out of view of the officers, looking back in the direction of the officers' flashing police lights twice thereafter. *Id.* at 501–02. The officers believed that in moving to the other side of the store it was the intent of the suspects to avoid police observation. The court concluded, however, that the suspects' actions, all seemingly innocuous, were too ambiguous to create reasonable

suspicion of criminal conduct where the officers "had no information about [the] two men nor any additional facts to support their claim of reasonable suspicion, other than the late hour and the "bad" neighborhood." *Id.* at 502.

Likewise, here, the court is not convinced that the manner in which Moore moved his vehicle back into the parking space upon noticing Officer Atkins's presence was sufficiently particular and objective to create reasonable suspicion of criminal activity. As in *Keith*, Moore's actions were decidedly "more ambiguous than the examples of 'evasion' that have contributed to findings of reasonable suspicion in other cases." *Keith*, 559 F.3d at 505-06 (collecting cases). For example, in *United States v. Craig*, 306 Fed. App'x 256 (6th Cir. 2009), where the court found reasonable suspicion for a *Terry* stop, the defendants' conduct was considered evasive not just because the defendants abruptly changed direction upon noticing police, but because, after doing so, they chose an unnecessary and indirect exit route from the parking lot. *Id.* at 262. In this case, the officers interpreted the Camry's abrupt change in trajectory as evincing an intent to avoid police attention, but without more to suggest that any of the occupants of the Camry were, had been, or were about to engage in criminal activity, it cannot be said that the officers' decision to conduct an investigative

seizure was based on anything more than an "unparticularized suspicion or 'hunch.'" *See Terry*, 392 U.S. at 27.

In sum, the totality of the circumstances here did not amount to reasonable suspicion. The seizure was therefore illegal and in violation of the Fourth Amendment.

C.    Fruit of the Poisonous Tree

"If a stop is not justified at its inception, any evidence resulting therefrom must be excluded" as fruit of the poisonous tree. *Johnson*, 620 F.3d at 696 (citing *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008)). The seizure of the handgun, the marijuana, and the ammunition "were the direct result of the initial, unlawful *Terry* stop; if [Officer Atkins] had not parked his patrol car [behind Moore's] vehicle, the events leading up to the search would not have occurred, and [the officers] would not have searched [the Camry]" and found the items of physical evidence that support the indictment. *See See*, 547 U.S. at 314.

### III. RECOMMENDATION

Because the government has failed to establish that the officers had a reasonable and particularized basis for suspecting Gleason of criminal activity, it is recommended that Gleason's motion to suppress be granted.

Respectfully submitted this 28th day of February, 2013.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE